Case No. 22-50924

# In the United States Court of Appeals for the Fifth Circuit

———— ♦ ————

Judy Harward; Brent Harward; 3325 Westlake Owners, L.L.C.;
Kirk Fritschen, as trustee of the 3705 Westlake Trust;
4200 Rivercrest, L.L.C.; et al.,

*Plaintiffs–Appellants,*

v.

City of Austin,

*Defendant–Appellee.*

———— ♦ ————

Appeal from Case No. 1:21-CV-00095
in the United States District Court
for the Western District of Texas

———— ♦ ————

**APPELLANTS' BRIEF**

———— ♦ ————

Ernest A. Young
3208 Fox Terrace Drive
Apex, North Carolina 27502
919-360-7718
young@law.duke.edu

Christopher S. Johns
  *Counsel of Record*
JOHNS & COUNSEL PLLC
2028 East Ben White Boulevard
Suite 240-1000
Austin, Texas 78741
512-399-3150
cjohns@johnsandcounsel.com

*Counsel for Plaintiffs–Appellants*

## CERTIFICATE OF INTERESTED PERSONS

## Case No. 22-50924

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of the Court may evaluate possible disqualification or recusal.

**Landowner Plaintiffs-Appellants**
c/o Christopher S. Johns
JOHNS & COUNSEL PLLC
2028 East Ben White Boulevard
Suite 240-1000
Austin, Texas 78741
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com

*Landowner Plaintiffs-Appellants own property along the shores of Lake Austin. They are seeking a determination that their properties are not in the City of Austin's full-purpose jurisdiction.*

**City of Austin, Texas**
c/o Hannah M. Vahl
CITY OF AUSTIN LAW DEPARTMENT
P. O. Box 1546
Austin, Texas 78167
512-974-2346
512-974-1311 fax
hannah.vahl@austintexas.gov

*The City of Austin, Texas started assessing ad valorem taxes on property owned by Landowner Plaintiffs-Appellants beginning in 2019.*

**Travis Central Appraisal District**
c/o Marya Crigler, Chief Appraiser
850 East Anderson Lane
Austin, Texas 78752

*The Travis Central Appraisal District is responsible for appraising ad valorem taxes in Travis County, Texas.*

  /s/ Christopher S. Johns
Christopher S. Johns
*Attorney of Record for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The Plaintiff-Appellant Homeowners believe oral argument would aid the Court in evaluating the important questions of statutory interpretation raised by this appeal. The district court adopted a reading of the Tax Injunction Act contrary to Supreme Court authority—a reading that, left undisturbed, could deprive Texas property owners of all recourse against municipal annexation by fiat. Given these stakes, the Homeowners respectfully submit that this appeal merits oral argument and full Class III treatment.

## TABLE OF CONTENTS

Certificate of Interested Persons .................................................ii

Statement Regarding Oral Argument .........................................iv

Table of Contents ......................................................................v

Table of Authorities.................................................................vii

Jurisdictional Statement............................................................xi

Statement of the Issue...............................................................xii

Introduction...............................................................................1

Statement of the Case ................................................................6

Standard of Review ..................................................................16

Summary of the Argument........................................................16

Argument..................................................................................18

    I.    The Tax Injunction Act does not bar challenges to a municipality's annexation of property to its full-purpose jurisdiction. ........................................... 20

        A.    Controlling Supreme Court precedent limits the TIA's application to three official acts that do not include annexation. ........................... 20

        B.    The Homeowners challenge "a separate legal mandate" from those barred by the TIA. ...........................................................27

        C.    The TIA was enacted to control the manner of tax protests, not suits that contest annexation. ...............................................30

II.    The Homeowners lack a plain, speedy, and efficient state remedy. ........................................ 33

    A.    Texas's exclusive tax-protest system fails to provide a "plain, speedy and efficient" remedy for the Homeowners' claims. ...................34

    B.    Texas's *quo warranto* scheme is inapplicable and does not provide a "plain, speedy and efficient remedy." .....................................39

III.    The district court incorrectly ignored remedies not subject to the TIA. ........................................ 40

IV.    The City presented no other viable grounds for dismissing the Homeowners' complaint. ........................... 42

    A.    There are no grounds for abstention, and this case does not present a political question. .......................................43

    B.    The Homeowners have standing to challenge the City's illegal annexation of their properties. ...........................47

    C.    Governmental immunity poses no hurdle to the Homeowners' federal declaratory-judgment claims. ...................................... 48

    D.    The Homeowners adequately pleaded each of their claims for relief. .............................49

Conclusion ................................................................ 50

Certificate of Service .............................................. 52

Certificate of Compliance ...................................... 53

# TABLE OF AUTHORITIES

## Cases

*Alexander Oil Co. v. City of Seguin*,
   825 S.W.2d 434 (Tex. 1991) ..................................................... 39, 48

*Am. Bank & Trust Co. of Opelousas v. Dent*,
   982 F.2d 917 (5th Cir. 1993) ............................................................ 45

*Barringer v. Griffes*,
   964 F.2d 1278 (2d Cir. 1992) ........................................................... 40

*Burford v. Sun Oil Co.*,
   319 U.S. 315 (1943) ......................................................................... 46

*Cameron Appraisal Dist. v. Rourk*,
   194 S.W.3d 501 (Tex. 2006) ............................................................ 35

*Chamber of Commerce v. IRS*,
   No. 1:16-CV-944-LY, 2017 WL 4682050
   (W.D. Tex. Oct. 6, 2017) ......................................................... 23, 26

*CIC Services, LLC v. Internal Revenue Service*,
   141 S. Ct. 1582 (2021) ..................................................................... 27

*Direct Marketing Association v. Brohl*,
   575 U.S. 1 (2015) ......................................................................*passim*

*Firefighters' Retirement Sys. v. EisnerAmper, L.L.P.*,
   898 F.3d 553 (5th Cir. 2018) ........................................................... 43

*Franklin v. United States*,
   49 F.4th 429 (5th Cir. 2022) ........................................................... 29

*Haywood v. Drown*,
   556 U.S. 729 (2009) ......................................................................... 48

*Hibbs v. Winn*,
   542 U.S. 88 (2004) .................................................... 18, 30, 38, 40

*Humphries v. Elliott Co.*,
    760 F.3d 414 (5th Cir. 2014)......................................................49-50

*Knick v. Township of Scott*,
    139 S. Ct. 2162 (2019) ............................................................... 41

*Kuwait Pearls Catering Co., WLL v. Kellogg Brown & Root Servs., Inc.*,
    853 F.3d 173 (5th Cir. 2017) ............................................................46

*Laufer v. Mann Hosp., L.L.C.*,
    996 F.3d 269 (5th Cir. 2021) ......................................................... 16

*Levin v. Commerce Energy, Inc.*,
    560 U.S. 413 (2010) ........................................................................44

*MAG-T, L.P. v. Travis Cent. Appraisal Dist.*,
    161 S.W.3d 617 (Tex. App.—Austin 2005, pet. denied) .................36

*Martin v. Hunter's Lessee*,
    14 U.S. (1 Wheat.) 304 (1816) (Story, J.) ...................................37-38

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ............................................................................ 43

*Nat'l Cas. Co. v. Gonzalez*,
    637 F. App'x 812 (5th Cir. 2016).....................................................44

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
    491 U.S. 350 (1989)........................................................................ 47

*Nissan Motor Corp. in U.S.A. v. Harding*,
    739 F.2d 1005 (5th Cir. 1984).........................................................46

*Quackenbush v. Allstate Ins. Co.*,
    517 U.S. 706 (1996) ........................................................................44

*Reich v. Collins*,
    513 U.S. 106 (1994) ....................................................................... 37

*Reid v. Aransas Cnty.*,
    805 F. Supp. 2d 322 (S.D. Tex. 2011) .........................................48-49

*Rosewell v. LaSalle Nat. Bank,*
    450 U.S. 503 (1981) ..................................................... 34, 36

*Sprint Commc'ns, Inc. v. Jacobs,*
    571 U.S. 69 (2013) ..............................................................44

*Superior Oil Co. v. City of Port Arthur,*
    535 F. Supp. 916 (E.D. Tex. 1982) ....................................32

*Superior Oil Co. v. City of Port Arthur, Tex.,*
    553 F. Supp. 511 (E.D. Tex. 1982) ....................................32

*Trinity Marine Prods., Inc. v. United States,*
    812 F.3d 481 (5th Cir. 2016) .............................................43

*Webster v. Doe,*
    486 U.S. 592 (1988) ..........................................................38

*Werthmann v. City of Fort Worth,*
    121 S.W.3d 803 (Tex. App.—Fort Worth 2003, no pet.) ...........47-48

**Statutes**

26 U.S.C. § 7421 ....................................................................27

28 U.S.C. § 1291 ......................................................................xi

28 U.S.C. § 1331 ......................................................................xi

28 U.S.C. § 1341 ...............................................................*passim*

28 U.S.C. § 1343 ......................................................................xi

28 U.S.C. § 1367 ......................................................................xi

AUSTIN, TEX. CITY CHARTER art. I, § 6 ..................................14

AUSTIN, TEX. CITY CHARTER art. I, § 7 .....................................6

TEX. CIV. PRAC. & REM. CODE § 66.002....................................39

TEX. LOC. GOV'T CODE §§ 43.052–43.065 .................................14

TEX. LOC. GOV'T CODE § 43.130 .................................................. 6

TEX. LOC. GOV'T CODE § 43.134 ................................................ 10

TEX. LOC. GOV'T CODE § 43.136 ................................................ 8

TEX. LOC. GOV'T CODE ch. 43, subchapter C ........................... 11

TEX. TAX CODE § 6.07 ...................................................... 14, 24

TEX. TAX CODE § 21.01 ......................................................... 14

TEX. TAX CODE §§ 25.01–25.24 ...................................... 14, 35

TEX. TAX CODE §§ 26.01–26.09 ........................................ 14-15

TEX. TAX CODE § 31.01 .......................................................... 15

TEX. TAX CODE § 41.41 ..................................................... 34-35

TEX. TAX CODE § 42.031 ............................................. 15, 36-37

TEX. TAX CODE § 42.08 ......................................................... 31

U.S. CONST. art. VI, cl. 2 .......................................................... 48

### JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this case includes causes of action "arising under the Constitution, laws, or treaties of the United States." The district court also had jurisdiction under 28 U.S.C. § 1343(a)(3) because the Plaintiff-Appellant Homeowners seek to redress the deprivation of federal constitutional rights under color of state law. And given these bases for original federal jurisdiction, the district court had supplemental jurisdiction over the Homeowners' state-law claims as well. *See* 28 U.S.C. § 1367. This Court has appellate jurisdiction because the district court's dismissal of the Homeowners' case is a "final decision" for purposes of 28 U.S.C. § 1291.

The district court entered a final judgment dismissing the Homeowners' case without prejudice on September 29, 2022. ROA.2268. The Homeowners timely filed their notice of appeal on October 14, 2022. ROA.2269–71. *See* FED. R. APP. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUE

The Tax Injunction Act deprives federal courts of jurisdiction over suits seeking to enjoin, suspend, or restrain the assessment, levy, or collection of local taxes. In this case, the Plaintiff-Appellant Homeowners challenge the validity of a municipal ordinance that purportedly annexed their properties to the City of Austin's full-purpose jurisdiction, actions which were separate from and occurred before any activities constituting "assessment," "levy," or "collection" of local taxes for those properties.

Is the Homeowners' suit barred by the Tax Injunction Act?

## INTRODUCTION

In the summer of 2019, the City of Austin purported to annex a swath of lakefront properties. The City's actions were baldly illegal: they flouted state and local annexation laws and violated the Plaintiff-Appellant Homeowners' rights under both the federal and state constitutions. The Homeowners have spent the past three and half years trying to right the City's wrongs—first by administrative protest, then by lawsuit. But the City is determined to deny the Homeowners their day in court. Its strategy is clear: set up a venue shell game that would bar Texas homeowners from challenging annexation by fiat in *any* court *anywhere* in the country.

That, of course, cannot be the proper outcome. The Homeowners ask the Court to confirm two bedrock principles of our legal system: (1) that for the violation of important statutory and constitutional rights, there must be a remedy, and (2) that governments must apply the law fairly to everyone.

The City began violating those principles in 2019, when it claimed to annex the Homeowners' properties and then instructed the appraisal district to start assessing municipal property taxes on the Homeowners' land. The Homeowners had never paid City taxes before—and for good reason: at no point in the past 130 years have their properties been within the City's taxing

1

jurisdiction. Instead, as the State and the City have repeatedly affirmed over the decades, these properties cannot be taxed because they lie outside the City's full-purpose jurisdiction.

The properties' legal history dates back to 1891, when the Texas Legislature annexed strips of land along the old shoreline to the City of Austin for flood control. When the river was dammed, water levels rose and inundated the strips of land that had been annexed to the City. Over the years, state and local authorities made clear that any remaining dry land along the river was outside the City's taxing jurisdiction, an understanding that was confirmed in a 1913 state law, a 1953 City charter, a 1967 City Council resolution, a 1986 City Council ordinance, and—most crucially—a spate of reforms passed by the Texas Legislature in 1987 to curb annexation abuse. Among other things, those reforms automatically disannexed the Homeowners' properties in 1988.[1]

In short, up until 2019, the Homeowners' properties had never been part of the City's taxing jurisdiction. And this wasn't just the law; it was also a fair bargain. After all, the Homeowners have never received the basic

---

[1] The Legislature assumed that the riverside properties were in the City's limited-purpose jurisdiction as of 1987. The historical record raises some doubt about whether that was the case—there's reason to believe that the properties have always remained in the City's extraterritorial jurisdiction. Either way, the City couldn't tax them.

municipal services that would justify their payment of City taxes, nor could they vote or run for office in certain City elections. The vast majority of their properties lack City water, wastewater, trash collection and recycling, and reliable emergency response, among other services. Many don't even get City electricity. Lacking City services, the Homeowners have found ways to meet these basic needs themselves: for example, they pay for water filtration and storage systems, membership in special utility districts, septic systems, and private trash collection. They also rely on one another—not the City—in emergencies.

The Homeowners had no major quarrel with this state of affairs. And, as far as they knew, neither did the City of Austin. But then, in early June 2019, the press misleadingly reported on the lakefront properties' tax status, claiming that "many of Austin's elite" were receiving a "lakefront tax break." There were two legal ways for the City to deal with the resulting political uproar: (1) it could have attempted to annex the Homeowners' property using the procedures prescribed by Texas law, which would have required the City to (among other things) provide the Homeowners full municipal services, or (2) it could have left the Homeowners' properties

unannexed and saved the taxpayers the burden of extending municipal services to them.

Instead, the City chose a third, illegal option. City Council simply declared that the Homeowners' properties had always been in the City's full-purpose jurisdiction and had merely been enjoying an unwarranted tax exemption for over 130 years. The City then ordered Travis Central Appraisal District (TCAD) to put the Homeowners' land on the City's tax rolls—even though the Texas Legislature had disannexed those properties more than 30 years earlier and even though City still had no plans to provide them municipal services.

The City contends that this annexation by fiat entitles it to enjoy the best of all worlds: collecting tax revenue it isn't entitled to while shirking its obligation to provide basic municipal services and avoiding inconvenient state annexation laws and other rules that would permit the Homeowners to object. Given these facts, there is little question that the Homeowners will win on the merits of their claims—if they are ever allowed to make them. That's why the City wants to engage this Court in a rigged shell game on venue—a ploy that would prevent the Homeowners from challenging the City's actions in any court anywhere on earth.

Under Texas statute, the Homeowners cannot make the City a party to their tax-protest lawsuit with TCAD. And under Texas appellate case law binding on these landowners, the Homeowners cannot sue the City directly in a state court of general jurisdiction, either. Now, by accepting the City's misguided arguments about the federal Tax Injunction Act (TIA), the district court has barred the Homeowners from challenging the City's actions in federal court as well. Thus, if this Court affirms the district court's ruling, the Homeowners will likely not be able to argue the merits of their claims anywhere.

But in truth, the TIA has no role to play in this case. In fact, the TIA is carefully constructed in three ways that ensure the Homeowners have a remedy in federal court. First, the footprint of the TIA is actually quite small. Recent, binding Supreme Court precedent confirms that this case does not touch on any of the taxation activities listed in the TIA. Second, for the TIA to apply, the Homeowners must have a "plain, speedy and efficient remedy" in state court, but Texas law deprives them of any state-court remedy at all. Third, the TIA requires a claim-by-claim, remedy-by-remedy analysis of the Homeowners' suit, an analysis the district court failed entirely to perform.

In short, the district court erred in adopting the magistrate judge's report and recommendation dismissing the Homeowners' case under the TIA. The Homeowners are challenging just the sort of local-government abuses for which the federal courts are uniquely well situated, and there is no statutory bar to the exercise of federal jurisdiction. The district court's judgment should be vacated and the case remanded for full adjudication on the merits.

## STATEMENT OF THE CASE

This case is about the City of Austin's illegal annexation of the Homeowners' properties. Examination of the historical record proves that the Homeowners' properties have *never* been in the City's full-purpose jurisdiction. For more than a century, the properties have been legally recognized as lying either outside City limits altogether or in the City's limited-purpose jurisdiction. Either way, state law and the City's own charter prohibit the properties' taxation without proper annexation. *See* TEX. LOC. GOV'T CODE § 43.130(c); AUSTIN, TEX. CITY CHARTEr art. I, § 7.

The Homeowners' Second Amended Complaint—whose allegations must be taken as true for purposes of this appeal—includes a detailed account of the properties' legal history. *See* ROA.619–32. The following

chronology summarizes the key events in that history and is illustrated by a timeline attached as Appendix 1:

- **1839:** The Third Texas Congress incorporated the City of Austin and defined its limits, which stopped several miles east of the Homeowners' properties. ROA.708.

- **1891:** The Texas Legislature annexed to the City of Austin narrow strips of land—extending 10 varas (27.78 feet) horizontally from the shoreline along both sides of the Colorado River—for the limited purpose of allowing the City to build and protect the first Austin Dam.[2] ROA.590–91, 619–20; *see* ROA.970–74 (Act of April 3, 1891, 22nd R.S., ch. 22, § 2, 1891 Tex. Gen. Laws 101, 101–02). The City did not tax this land or even list it on the tax rolls as taxable property. ROA.645.

- **1909:** In a new charter, the Legislature reaffirmed the 10-vara line as the City limits. ROA.620; *see* ROA.1042–54 (Act of Feb. 3, 1909, ch. 2, art. I, § 2, 1909 Tex. Gen. Laws 8, 9–10).

---

[2] Early Texas Legislatures often used this Spanish unit of measure, equivalent to 33-1/3 inches. *See Vara*, HANDBOOK OF TEXAS ONLINE, https://www.tshaonline.org/handbook/entries/vara (Feb. 5, 2019).

- **1913:** The Legislature enacted a law allowing cities to extend their boundaries to include land on both sides of navigable streams, codifying what it had done for the City in 1891. ROA.620–21; *see* ROA.1056–57 (Act approved March 17, 1913, 33rd R.S., ch. 25, § 1, 1913 Tex. Gen. Laws 47, 47–48). Under the version of the law that remains in force today, cities can regulate navigation and wharfage in these riverside strips, but they still cannot tax them. TEX. LOC. GOV'T CODE § 43.136(e).

- **1940:** The Tom Miller Dam was completed to replace two earlier dams that had been destroyed by floods. This new dam raised water levels higher than they had been before, leaving the original annexed narrow strips of land underwater. ROA.591–92, 623–24; *see Highland Lakes and Dams*, LOWER COLORADO RIVER AUTHORITY, https://www.lcra.org/water/dams-and-lakes/ (last accessed Jan. 17, 2023); ROA.980 (1946 Austin Boundaries Jurisdiction Map).

- **1953:** A new charter confirmed the City's boundary as the 10-vara line on either side of the river.[3] ROA.623.

- **1967:** In the 1960s, City Council recognized some uncertainty about the location of the City's limits along Lake Austin. After receiving historical briefing on the shoreline properties' status, City Council concluded in 1967 that the 10-vara line was the proper boundary and issued a unanimous resolution declaring "[t]hat the corporate limit line of the City of Austin be . . . 10 varas from the old [1890s] lake level." ROA.624–27; *see* ROA.986 (Austin, Tex., Ordinance 860130-A). As noted above, the land below the 10-vara line is mostly or entirely submerged.

- **1985:** The City Auditor erroneously listed the Homeowners' properties on the City's tax roll for the first time ever. ROA.628.

- **1986:** Confessing an "error" had been made in the 1985 appraisal rolls, City Council passed an ordinance "declaring the limited purpose jurisdiction status of all shoreline properties" to resolve

---

[3] This charter nullified the City's earlier, unlawful attempts in 1928 and 1938 to extend its boundaries from the 10-vara line to a contour line "504.9′ above mean sea level" on both banks of the river. ROA.621–23. But even if the City *had* properly annexed up to this higher contour line, much of the Homeowners' land would remain outside City limits, and the portion inside City limits would still be limited-purpose and thus untaxable. *See* ROA.623.

any "confusion" regarding their legal status. ROA.628–30; *see* ROA.988–90 (Austin, Tex., Ordinance 860130-A (Jan. 30, 1986)). The 1986 Ordinance also recognized that the City could not tax these properties until it provided them with full municipal services. ROA.989.

- **1987:** The Legislature responded to concerns about Austin's abuse of limited-purpose jurisdiction by passing statewide laws to curb existing problems and protect landowner rights. ROA.630; *see* ROA.1006 (1987 Tex. H. Comm. Rep., S.B. 962 "Bill Analysis, Background"). The 1987 legislation (1) required municipalities to convert all limited-purpose-jurisdiction areas to full-purpose jurisdiction—or disannex them completely—within 16 months, and (2) mandated that strips of land previously annexed along navigable streams (e.g., the Homeowners' properties) would be automatically disannexed if a municipality failed, within one year, to annex them for full purposes. *See* ROA.1008–30 (Act of May 30, 1987, 70th Leg., R.S., ch. 1077, §§ 4, 5, 7, art. 970c, 1987 Tex. Gen. Laws 3674, 3676–79, later codified as TEXAS LOC. GOV'T CODE § 43.134 (2000)). The City took no action regarding the

Homeowners' properties, meaning that if they had *ever* been part of the City, they were automatically disannexed in 1988.

The 1987 laws also created substantive rights and detailed processes to protect landowners in all future annexations. *Id.* They mandated, for example, that municipalities create a municipal-services plan and then actually provide services when annexing property to full-purpose jurisdiction. Since 1987, the Legislature has added many more landowner protections, making annexations much more difficult for municipalities. *See, e.g.*, TEX. LOC. GOV'T CODE ch. 43, subchapter C.

- **2018:** The City considered what it would cost to provide the shoreline properties with full municipal services so that they might be annexed and taxed. Ultimately, the City found it would be too expensive and too difficult to extend services to the properties. ROA.631–32.

Three key takeaways from this history stand out. First, for more than a century, the City and State recognized that the Homeowners' properties were outside Austin's full-purpose jurisdiction, and accordingly the City never provided them with services and thus never attempted to tax them.

Second, even if the Homeowners' properties *were* part of the City at some point, state law automatically disannexed them in 1988. And third, if the City wanted to annex the Homeowners' properties, it was obliged by state and local law to follow a detailed set of procedures and to start providing the properties municipal services. It also needed landowner consent to annex the properties—which the Homeowners never would have given.

These were inconvenient truths for the 2019 City Council when a series of newspaper articles decried "tax-exempt mansions on Lake Austin."[4] When constituents complained about what they perceived as special treatment for rich folks, City Council reacted with a radical ploy. Rather than follow the law, Council passed an ordinance that not only (1) claimed to repeal the City's 1986 Ordinance that had "declar[ed] the limited purpose jurisdiction status" of the Homeowners' properties, but also (2) inaccurately asserted that the properties had been in the City's full-purpose jurisdiction "at all times" since 1891 and thus were subject to municipal taxes. ROA.1034–35 (Austin, Tex. Ordinance 20190620-087). These politically motivated "findings" conveniently disregarded that the

---

[4] *See, e.g.*, Philip Jankowski, *Lakefront Tax Break*, AUSTIN AMERICAN-STATESMAN (June 7, 2019), https://www.statesman.com/story/news/local/flash-briefing/2019/06/07/lakefront-tax-break-why-mansions-on-lake-austin-are-exempt-from-city-taxes/4880629007/.

original 10-vara strips were underwater and were not part of the Homeowners' properties on the new shoreline at all. For an ordinance that aimed to upend 130 years of legal precedent, it was remarkably sparse. There were no studies, surveys, or even background information—only the following bare assertions:

**ORDINANCE NO. 20190620-087**

**AN ORDINANCE REPEALING ORDINANCE NO. 860130-A RELATING TO ALL PROPERTIES LYING ALONG LAKE AUSTIN BELOW THE 504.9-DEGREE MEAN SEA LEVEL CONTOUR LINE.**

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF AUSTIN:**

**PART 1.**  The City Council makes the following findings:

    a)  Article 8, Section 1 of the Texas Constitution mandates that property taxation be equal and uniform;

    b)  The City Council in 1986 enacted Ordinance No. 860130-A, which resulted in the properties identified in that ordinance not being subject to City ad valorem taxes;

    c)  The properties identified in Ordinance No. 860130-A are within the City's full-purpose jurisdiction and have been at all times since the 1891 Act of Incorporation;

    d)  The properties identified in Ordinance No. 860130-A are subject to taxation by the City because they are within City limits; and

    e)  It is also fair that these properties be taxed because they receive taxpayer-funded City services and their residents can register to vote in City elections.

**PART 2.**  Ordinance No. 860130-A is repealed.

Although the 2019 Ordinance had the purported effect of taking the Homeowners' properties out of the City's limited-purpose or extraterritorial jurisdiction and placing them in its full-purpose, taxable jurisdiction, the City

did not observe any of the procedures and limitations that the Legislature and the City's own charter impose on municipal annexations. To take just a few examples, the City did not provide notice, obtain landowner consent to the annexation, hold adequate hearings, develop a land use and intensity plan, or create any plan to provide municipal services to the properties.[5] ROA.632–36, 642–44; *see generally* TEX. LOC. GOV'T CODE §§ 43.052–43.065; AUSTIN, TEX. CITY CHARTER art. I, § 6.

After purportedly adding the Homeowners' properties to its full-purpose jurisdiction, the City ordered Travis Central Appraisal District (TCAD) to include the properties on the City's tax rolls, and TCAD complied.[6] The Appraisal Review Board (ARB)—the administrative body

---

[5] The full extent of the City's disregard for annexation law is illustrated in the decision tree attached here as Appendix 2.

[6] The steps of municipal taxation can be summarized briefly. In Texas, local taxing units—local government entities—must first determine their jurisdictional boundaries. TEX. TAX CODE § 6.07. Once they've done so, and thereafter whenever those boundaries change, they must report their boundaries to their county appraisal district. *Id.* These county appraisal districts then appraise the market value of each property within its county. *Id.* §§ 21.01, 25.01. Then, the appraisal district prepares the county's appraisal records; these records include both the appraised value of and relevant taxing units for each property in the county. *Id.* § 25.02.

Disputes between the county appraisal district and property owners are decided by a board of local citizens appointed by the county administrative judge and collectively known as an appraisal review board. *Id.* § 25.22. Once any disputes have been resolved, the appraisal review board revises the appraisal records, and the revised records become the county's appraisal roll. *Id.* § 25.24. The district's chief appraiser must then certify the appraisal roll to the taxing units, and once he has, the taxing units can approve the annual tax rate and notify the county tax assessor-collector of its newly approved rate. *Id.* §§ 26.01, 26.05.

with exclusive jurisdiction over tax protests—refused in the ARB hearings to consider the Homeowners' objections to the City's assertion of full-purpose jurisdiction. The ARB said it lacked jurisdiction to consider such matters, explaining that the Homeowners' quarrel was with the entity that allegedly violated the law: the City. ROA.640. But Texas law prohibited the Homeowners from suing the City in the state-court tax protest; thus, having exhausted their administrative remedies, the Homeowners filed this suit in January 2021. *See* TEX. TAX CODE §42.031(b); ROA.177.

In September 2021, the City moved to dismiss the Homeowners' suit for lack of jurisdiction and failure to state a claim. ROA.775. *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6). The magistrate judge analyzed only one of the City's arguments—that the TIA barred federal-court jurisdiction over the Homeowners' challenge—and recommended dismissal on that basis. ROA.2188–2205. The Homeowners objected, marshaling extensive authority to show that their case falls well outside the TIA's ambit. ROA.2210–31. Without waiting to hear the City's response, the district court

---

Only after the tax rate is approved are taxes assessed. *Id.* §§ 26.05, 26.09. Using the appraisal roll, the county tax assessor-collector calculates assessed values, determines the tax due for each property, creates the tax roll, prepares the property tax bills, and mails the bills to property owners. *Id.* §§ 26.09, 31.01. The Travis County Tax Assessor–Collector also collects all the property tax for the county and transfers the appropriate collected amount to each government entity.

adopted the magistrate judge's recommendation in a summary order that included no analysis of the Homeowners' objections. ROA.2266–67; *see* ROA.2268 (final judgment). The Homeowners now appeal the dismissal of their complaint.

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's dismissal for lack of subject matter jurisdiction." *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 271 (5th Cir. 2021). Where, as here, the lower court "rules on jurisdiction without resolving factual disputes," the Fifth Circuit "consider[s] the allegations in the plaintiff's complaint as true" and reviews only whether the lower court correctly applied the law. *Id.* (quoting *St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5th Cir. 2009)).

## SUMMARY OF THE ARGUMENT

Cities have considerable latitude in deciding which areas will be full-purpose jurisdiction, which will be limited-purpose, and which will remain outside city limits. But in exercising that power, cities must observe the law—federal, state, and local.

The City of Austin is well acquainted with proper annexation procedures: it routinely follows them when it annexes properties to its full-

purpose jurisdiction. In this case, though, the City chose to disregard the law. Instead, it attempted to rewrite history by repealing the City's 1986 recognition of the Homeowners' properties' non-taxable status, disregarding the Texas Legislature's automatic disannexation of their land in 1988, and falsely claiming that the properties had always been within the City's full-purpose jurisdiction since 1891. Put another way, the City attempted to change the properties' status retroactively by fiat so that it would not have to comply with the law as it stands today. In doing so, the City flouted state law, disregarded the limits of the Austin City Charter, and trampled the Homeowners' rights under the Texas and United States Constitutions.

Now, the City seeks to thwart *all* judicial review of its illegal annexation. As the City well knows, the ARB and TCAD have disclaimed jurisdiction over the Homeowners' case, and binding precedent bars the Homeowners from suing the City directly in a state court of general jurisdiction, leaving them just one viable option for redress of the City's violations: this federal lawsuit.

The City's effort to avert merits consideration of its actions by shoehorning this case into the Tax Injunction Act is unavailing. The TIA

bars federal district courts from enjoining the assessment, levy, or collection of a state tax. 28 U.S.C. § 1341. But the Homeowners seek relief from unlawful annexation—not one of the actions listed in the TIA. *See Id.* And even if the case would otherwise fall within the TIA's ambit, the statute would still require the district court to exercise jurisdiction because the Homeowners lack a plain, speedy, and efficient remedy in Texas courts.

Because this case falls well outside the scope of the TIA, this Court should vacate the district court's judgment so that the litigation may proceed in the proper, federal forum. There is no call to address the City's other arguments for dismissal, none of which was addressed by the district court. Rather, in keeping with the longstanding rule that federal appellate courts should not pass upon arguments that the trial court did not reach, this Court need not delve into the City's alternative arguments. Regardless, if the Court chooses to do so, it should find each of the City's arguments meritless.

## ARGUMENT

In 1937, Congress passed the Tax Injunction Act to keep recalcitrant citizens from enlisting federal courts in their efforts to avoid paying state and local taxes. *See Hibbs v. Winn*, 542 U.S. 88, 102-04 (2004). The Homeowners, most of whom have already paid their taxes, brought this suit

to redress the City's unlawful effort to retroactively change the jurisdictional status of their homes. *See* ROA.589–93. This case, in other words, is about annexation. And although annexation does indeed have downstream tax consequences, it is well outside the scope of the TIA.

The City itself has conceded that the relief the Homeowners seek may not, "on its face, . . . appear to implicate the TIA," but it nevertheless contends that the spirit of the TIA bars any suit that might deprive the City of taxes. ROA.780. Accepting the City's reasoning, the district court dismissed the Homeowners' complaint, and adopted the magistrate judge's conclusions (1) that the "crux" of the Homeowners' claims is to "seek relief from City taxes" and (2) that Texas courts provide the Homeowners with a "plain, speedy and efficient remedy" for the City's illegal actions. ROA.2199, 2204, 2266–67. Both conclusions were error.

Because the TIA does not bar challenges to annexation and the Homeowners lack a plain, speedy, and efficient remedy in Texas courts, this Court should vacate the district court's judgment and remand the case for further proceedings on the merits.

I.      **The Tax Injunction Act does not bar challenges to a municipality's annexation of property to its full-purpose jurisdiction.**

The Tax Injunction Act codifies a "simple and straightforward" limit on federal-court jurisdiction over state tax administration. 17A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. JURIS. § 4237 (3d ed. 2022). Its one-sentence mandate provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. Under controlling Supreme Court precedent, the Homeowners' suit does *not* impede any of the tax functions listed in the TIA. Rather, it takes issue with a municipal action that lies beyond the TIA's scope.

A.      **Controlling Supreme Court precedent limits the TIA's application to three official acts that do not include annexation.**

In *Direct Marketing Association v. Brohl*, 575 U.S. 1 (2015), the Supreme Court flatly rejected the overbroad reading of the TIA that the district court adopted here. Rather than "bar every suit with . . . a negative impact" on state revenue, the statute bars only those suits that seek equitable relief from "an act of 'assessment, levy or collection.'" *Id.* at 7–8, 14. Annexation is

none of these. *Direct Marketing* narrowed the statute's reach by carefully confining the meaning of "assessment, levy [and] collection" to the narrow, technical sense that those terms are given in the Federal Tax Code. *See Direct Mktg. Ass'n*, 575 U.S. 1 at 8 (2015). As the terms are defined in this controlling framework, a challenge to the City's annexation of the Homeowners' properties falls outside the TIA's ambit.

The central holding of *Direct Marketing* is clear: the TIA deprives district courts of jurisdiction only over suits that seek equitable relief from narrowly defined acts of "assessment, levy or collection.'" *Id*. at 7–8. That case arose from a challenge to an information-gathering requirement of Colorado's tax laws. *Id* at 4-6. To improve its ability to assess and collect sales tax, Colorado had imposed notice-and-reporting requirements on retailers that sold goods in-state but lacked a physical presence in Colorado. *Id*. The plaintiffs, out-of-state retailers, sought to enjoin the law. *Id*. To decide whether the TIA barred the plaintiffs' suit, the Court looked to the meaning of "assessment," "levy," and "collection," disambiguating each by reference to the Federal Tax Code. *Id*. at 8.

The Court defined *assessment* as "the official recording of a taxpayer's liability, which occurs after information relevant to the calculation of that

liability is reported to the taxing authority." *Id*. at 9 (citing 26 U.S.C. § 1530).

At most, it could be understood as "an official action taken based on information already reported to the taxing authority." *Id*. Next, *levy* is defined as "an official governmental action imposing, determining the amount of, or securing payment on a tax." *Id*. at 10. And *collection* was defined to mean "the act of obtaining payment of taxes due," an act that is "part of the 'enforcement process . . . that "assessment" sets in motion.'" *Id*. (quoting *Hibbs*, 542 U.S. at 102 n.4).

Because "information gathering" is a discrete "phase of tax administration procedure that occurs *before* assessment, levy, or collection," the Court held that the retailers' suit was not barred by the TIA. *Id*. (emphasis added). The Court stressed that assessment, levy, and collection each "refer to discrete phases of the taxation process" and must therefore be treated as "a carefully selected list of technical terms." *Id*. at 8, 13. After *Direct Marketing*, it is not enough to conclude that the TIA bars a lawsuit merely because the plaintiffs seek relief that might *affect* taxation down the line; indeed, the case itself allowed a suit to proceed even though the statute at issue sought to improve Colorado's ability to collect an additional $20 million each year in tax revenue. *Id*. at 5. In short, the TIA is "not keyed to

all activities that may improve a State's ability to assess and collect taxes," but specifically "to the acts of assessment, levy, and collection themselves." *Id.* at 11–12.

Here, the Homeowners challenge the City's retroactive annexation of their properties without due process and in violation of the Texas Local Government Code, the City's own charter, and the Constitutions of Texas and the United States. Importantly, they do *not* challenge the City's right to assess, levy, or collect taxes on properties that are properly within its jurisdiction. This is the key distinction: assessment, levy, and collection are routine phases of the taxation process, all of which come long after the official act of enlarging a municipality's jurisdictional boundaries. *See Chamber of Commerce v. IRS*, No. 1:16-CV-944-LY, 2017 WL 4682050 (W.D. Tex. Oct. 6, 2017). Like the act of incorporating a new city, only in the loosest sense could annexation be considered a part of the taxation process at all.

Texas law separates (1) the institutional authority to assess, levy, and collect taxes from (2) the authority to determine jurisdictional boundaries and set tax rates. In the Homeowners' case, the authority to assess, levy, and collect taxes resides with the Travis Central Appraisal District (TCAD), but TCAD cannot begin tax assessment—much less levy or collection—until it

has been told which properties it has the right to tax. Meanwhile, the authority to determine jurisdictional boundaries and report them to TCAD lies with local taxing units like the City, which has a duty to determine its boundaries before notifying TCAD to start the tax process. TEX. TAX CODE § 6.07. To alter those boundaries, the City must follow mandatory state and local procedures that govern annexation. Only after a property has been validly annexed to the City's full-purpose jurisdiction and the City has conveyed that information to TCAD can TCAD proceed to assess, levy, and collect taxes on that property.

The following chart shows the wide gap between the actions that the Homeowners challenge and those phases of the taxation process that the TIA insulates from federal-court interference:



*Direct Marketing* squarely controls this case. Like the retailers in *Direct Marketing*, the Homeowners challenge a government action—here, the retroactive annexation of property by fiat—that came well before the three phases of taxation insulated by the TIA. No assessment could take place until the City had reported its jurisdictional boundaries to the taxing authority, and no such report could issue until the City had changed its boundaries in accordance with Texas annexation law. Because the equitable relief the

Homeowners seek would "act[] on" annexation—not the assessment, levy, or collection of state tax—the TIA does not bar their suit. *Id.* at 13.[7]

A recent case from the Western District of Texas illustrates the proper application of *Direct Marketing*. In *Chamber of Commerce v. IRS*, No. 1:16-CV-944-LY, 2017 WL 4682050 (W.D. Texas Oct. 6, 2017), the court considered a challenge to an IRS and Treasury Department rule concerning which corporate entities could benefit from so-called "tax inversion" deals. In holding that the TIA did not bar the suit, Judge Yeakel distinguished sharply between permissible challenges to rules governing who is subject to a tax and forbidden challenges to assessment or collection:

> [T]he Rule is not a tax, but a regulation determining who is subject to taxation under provisions of the Internal Revenue Code. . . . Enforcement of the Rule precedes any assessment or collection of taxes. Although the Rule may improve the government's ability to assess and collect taxes, enforcement of the Rule does not involve assessment or collection of a tax.

*Id.* at *3 (citing *Direct Marketing*, 575 U.S. at 13). Likewise, the Homeowners' challenge to the City's unilateral expansion of its full-purpose taxing jurisdiction is about "who is subject to taxation"; it thus "precedes any

---

[7] Moreover, as we argue further in Part III, *infra*, some of the relief requested by the Homeowners—in particular, an injunction requiring the City to provide them with services—would have no impact on taxes at all.

assessment or collection of taxes." *Id*. Under *Direct Marketing*, the TIA simply does not shield government action of this kind.

**B.     The Homeowners challenge "a separate legal mandate" from those barred by the TIA.**

Although the outcome of this suit is controlled by the TIA, the Anti-Injunction Act (AIA)—the federal-tax analogue on which the TIA was modeled—offers a useful comparator. Under the AIA, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." 26 U.S.C. § 7421(a). The Supreme Court has "assume[d] that words used in both Acts are generally used in the same way," and as with the TIA, it "discern[s] the meaning of the terms in the AIA by reference to the broader Tax Code." Direct Mktg., 575 U.S. at 8.

Particularly instructive is the Supreme Court's most recent tax-injunction case, *CIC Services, LLC v. Internal Revenue Service*, 141 S. Ct. 1582 (2021). *CIC Services* concerned an IRS notice that required taxpayers and advisors to report information about insurance transactions to the IRS. Unlike the reporting requirement in *Direct Marketing*, noncompliance with the IRS's requirement in *CIC Services* was punishable by financial penalties statutorily "'deemed' to be 'tax[es]' for purposes of the Code—including the Anti-Injunction Act." 141 S. Ct. at 1587 (quoting 26 U.S.C. § 6671(a)).

The IRS thus argued that "there is no real difference between a suit to invalidate the Notice and one to preclude the tax penalty." *Id.* at 1590. The Supreme Court unanimously rejected that argument, concluding that "[t]he suit contests, and seeks relief from, a separate legal mandate" from the tax in question. *Id.* at 1593.

As in *CIC Services*, the Homeowners challenge a "separate legal mandate": the annexation of their properties to the City's full-purpose jurisdiction. Under this rule, a lawsuit is barred only "when the target of a requested injunction is a tax obligation—or stated in the Act's language, when that injunction runs against the 'collection or assessment of [a] tax.'"[8] 141 S. Ct. at 1590. In contrast, the Homeowners do not target a tax obligation here; they target the City's unlawful annexation, and the relief they seek is a return to their properties' rightful jurisdictional status—not relief from tax obligations that might follow from a would-be valid annexation.

---

[8] Under this authority, the First Circuit recently allowed a suit to proceed against the IRS. *Harper v. Rettig*, 46 F.4th 1 (1st Cir. 2022). Suspecting that the IRS had unlawfully obtained his personal financial records from a digital-currency exchange via a third-party summons, the plaintiff sued the IRS for injunctive relief and monetary damages. *Id.* The *Harper* court, citing *CIC Services*, explained that the AIA is inapplicable when "'[t]he suit contests, and seeks relief from, a separate legal' wrong." *Id.* at 8 (quoting *CIC Services*, 141 S. Ct. at 1593).

This Court's most recent decision under the AIA recognized the importance of identifying whether the equitable relief that a plaintiff seeks targets a tax obligation rather than a separate legal mandate. *See Franklin v. United States*, 49 F.4th 429 (5th Cir. 2022). *Franklin* concerned a challenge to tax penalties assessed for misreporting taxes and failing to report a foreign trust. *See id.* at 432-33. To avoid payment of the fines—and his delinquent tax bill—the plaintiff sued the IRS. *Id.* Although his suit was couched partly in terms of procedural deficiencies in the IRS's penalty assessments, this Court correctly held that the plaintiff's relief ultimately targeted the IRS assessment: each of the plaintiff's claims logically assumed the invalidity of assessment. *Id.* at 435. Its observation that one of the suit's alleged deficiencies could "be characterized as occurring 'pre-assessment'" is not to the contrary; the plaintiff's challenge concerned procedural deficiencies with the assessment itself—not with a separate phase of administration— and thus amounted to a collateral attack on the IRS's assessment of tax penalties. *Id.* at 434.

The Court should apply that same reasoning here. An equally careful look at the Homeowners' requested relief reveals a target wholly apart from taxation. Unlike the plaintiff in *Franklin*, the Homeowners' claims fall

outside the TIA, as the Homeowners have brought no challenges to the State's tax procedures—only the City's unlawful annexation.

## C. The TIA was enacted to control the manner of tax protests, not suits that contest annexation.

Finally, in dismissing the Homeowners' suit, the district court ignored not only the text of the TIA but also its animating policy. The Supreme Court has confined the statute's application to the cases that "Congress wrote the Act to address, *i.e.*, cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes." *Hibbs*, 542 U.S. at 107. In its examination of the TIA's legislative history, the Court has recognized "two closely related, state-revenue-protective objectives" behind the Act. *Id.* 542 U.S. at 104.

First, it was meant "to eliminate disparities between taxpayers who could seek injunctive relief in federal court—usually out-of-state corporations asserting diversity jurisdiction—and taxpayers with recourse only to state courts, which generally required taxpayers to pay first and litigate later." *Id.* And second, it was intended "to stop taxpayers, with the aid of a federal injunction, from withholding large sums, thereby disrupting state government finances." *Id.* "Congress," in short, "trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge

route other than the one specified by the taxing authority." *Id.* And while the TIA properly bars suits seeking equitable relief from the assessment, levy, and collection of state tax, "[n]owhere does the legislative history announce a sweeping congressional direction to prevent federal-court interference with all aspects of state tax administration." *Id.* (internal quotation marks omitted).

Once more, the heart of this suit is a challenge to the City's illegal annexation of the Homeowners' properties, not to the taxes that flow downstream from annexation. The Homeowners did not file this suit to avoid paying taxes or to circumvent state-mandated procedures for challenging their tax bills. Most of the Homeowners, in fact, have already paid their taxes under protest; the rest withheld their taxes as expressly allowed by Texas statute pending resolution of their state-court suit against TCAD. *See* TEX. TAX CODE § 42.08. What's more, the challenge route urged by the district court is not available to the Homeowners; as discussed below, federal court is the only forum for the Homeowners' claims against the City.

The Homeowners are not the first to observe the incongruity between annexation and TIA policy. Four decades ago, another federal district court in this circuit recognized that a suit challenging a municipal annexation does

31

not implicate the TIA, even if the annexation brings the contested property within the municipality's taxing jurisdiction. In *Superior Oil Co. v. City of Port Arthur*, the court considered a claim that Port Arthur had unlawfully annexed a strip of submerged territory in the Gulf of Mexico to tax the plaintiff's drilling operations. 535 F. Supp. 916 (E.D. Tex. 1982).[9] The court held that "the principle of comity and the purposes of the Tax Injunction Act are not at stake" in a suit challenging the validity of a municipal annexation. *Id*. at 919. So too here.

The Homeowners suit against the City plainly challenges an unlawful act of municipal overreach, not the "assessment, levy or collection" of tax. 28 U.S.C. § 1341. Under no reasonable construction of the TIA can the Homeowners' suit be read to fall within its ambit. Consistent with its clear text and policy, the TIA's application has been confined by the Supreme Court, this Court, and other courts in this circuit to those cases alone that seek equitable relief from tax obligations. This is not one of them.

---

[9] *Superior Oil Co.* was amended in *Superior Oil Co. v. City of Port Arthur, Tex.*, 553 F. Supp. 511 (E.D. Tex. 1982), and reversed on other grounds in *Superior Oil Co. v. City of Port Arthur*, 726 F.2d 203 (5th Cir. 1984).

## II.    The Homeowners lack a plain, speedy, and efficient state remedy.

Even in a case that does implicate the "assessment, levy, or collection" of tax, the district court retains jurisdiction *unless* the state courts provide the plaintiffs with "a plain, speedy and efficient remedy" for their complaints. 28 U.S.C. § 1341. In fact, Texas courts offer no remedy at all for the Homeowners' claims here. Under Texas Tax Code's tax-protest scheme (the sole state remedy available to challenge property-tax matters), the Homeowners are prohibited by law from raising their core statutory and constitutional claims against the City. The Homeowners know this from experience: this litigation began in state court under the state's exclusive tax-protest scheme, where the Homeowners found that black-letter Texas law barred them from raising their central claims. On this fact alone, the TIA is inapt.

In concluding that the remedies available to the Homeowners are plain, speedy, and efficient, the district court made two errors. First, the district court incorrectly assumed that the Homeowners could have instituted their claims against the City in a state court of general jurisdiction instead of litigating first through the tax-protest process. But the tax protest suit is an exclusive—and inadequate—state remedy.

Second, the district court erred by assuming that the Homeowners must ask the Attorney General to institute a *quo warranto* proceeding before they can establish that no plain, speedy, and efficient remedy exists. The *quo warranto* scheme, however, has no place here: the Homeowners have private standing to sue the City for its void annexation, and they are under no obligation to seek or await help from the political branches.

In sum, Texas state courts offer no "plain, speedy and efficient remedy" for the Homeowners' claims, and so, for a second and independent reason, the TIA does not bar their suit.

## A. Texas's exclusive tax-protest system fails to provide a "plain, speedy and efficient" remedy for the Homeowners' claims.

The TIA requires a state-court remedy that "provides the taxpayer with a full hearing and judicial determination at which she may raise any and all constitutional objections to the tax." *Rosewell v. LaSalle Nat. Bank*, 450 U.S. 503, 514 (1981) (internal quotation marks omitted). No such remedy exists in Texas.

Rather, under Texas law, disputes that involve "identification of the taxing units in which the owner's property is taxable" are governed exclusively by the Texas Tax Code's tax-protest regime. TEX. TAX CODE

§ 41.41(a)(6). Protests are heard by an appraisal review board (ARB), which by law has exclusive jurisdiction over tax protests. *Id.* at § 25.22; *see Cameron Appraisal Dist. v. Rourk*, 194 S.W.3d 501, 502 (Tex. 2006). Thus, because this suit involves "identification of the taxing units in which the owner's property is taxable" and the tax-protest suit is exclusive, the Homeowners first brought their complaints before the ARB. Their efforts were unavailing.

The district court did *not* conclude that Texas's tax-protest scheme provides a "plain, speedy and efficient" remedy for the Homeowners, and for good reason: the ARB and TCAD cannot remedy the Homeowners' core claims. Indeed, when the Homeowners raised their complaints before the ARB, the ARB refused to consider them, saying that any dispute about whether the City had established that the Homeowners' properties fall within the City's full-purpose jurisdiction would have to be taken up with the City directly. ROA.640, 653.[10]

---

[10] The ARB can resolve factual disputes like whether a property lies outside the county, but it claims to be unequipped to make legal determinations; and, according to the ARB panel chair, it "doesn't have the authority to determine taxing jurisdictions." *See* TCAD-ARB Hr'g for PID 122344, Sept. 18, 2020, available at https://tinyurl.com/tcad-20-9-18-arb-122344 (starting at 4:19 of recording); *see also* ROA.640, 653. A TCAD representative made a similar claim: "TCAD is not responsible for the change" to the taxing units, and "questions involving services and de-annexation should be directed to the City of Austin." TCAD-ARB Hr'g for PID 122344, Sept. 18, 2020, available at https://tinyurl.com/tcad-20-9-18-arb-122344 (starting at 4:19 of recording).

But that approach is forbidden by Texas law. TEX. TAX CODE § 42.031(b). Taxing units, like the City, cannot "intervene in or in any other manner be made a party, whether as defendant or otherwise, to an appeal of an order of the appraisal review board determining a taxpayer protest." *Id.* In other words, both before the ARB and on judicial review of the ARB's determination, Texas law forecloses the Homeowners from litigating against the entity they allege violated their state and federal rights: the City. Forbidden by law from bringing their core claims against the actual offender, the Homeowners lack the "full hearing and judicial determination" that the TIA requires. *Rosewell*, 450 U.S. at 514.

And had the Homeowners filed suit against the City in a state court of general jurisdiction instead of against TCAD, as the magistrate judge suggested, the City would have insisted on the exclusivity of the tax-protest procedure. Under appellate precedent binding on the Homeowners, a taxpayer's constitutional claims "d[o] not excuse" them from litigating through the tax-protest process. *MAG-T, L.P. v. Travis Cent. Appraisal Dist.*, 161 S.W.3d 617, 630–32 (Tex. App.—Austin 2005, pet. denied). In *MAG-T*, the Austin court of appeals held that a landowner's suit for constitutional violations against governmental defendants, including the county tax

assessor-collector, could not be brought directly but instead needed to be brought in an appeal from the TCAD/ARB process—even though the tax assessor-collector could not have been joined as party in the judicial review of that proceeding. *Id.*

Based on that case law, the TIA does not bar the Homeowners' federal suit here, as the Homeowners' remedy in state court for their complaints against the City is anything but "plain, speedy and efficient." 28 U.S.C. § 1341. If the Homeowners *had* sued the City directly, *MAG-T* suggests that Texas courts would have told them they needed to bring those claims against the City in the TCAD lawsuit, which in turn is impossible according to Texas statute. *See* Tex. Tax Code § 42.031(b). Due to this Catch-22 quirk in Texas's tax-protest regime, the Homeowners likely have no remedy at all against the City in state court. That creates a serious due-process problem for the State. *See, e.g., Reich v. Collins*, 513 U.S. 106, 109 (1994) (stating that due process requires that state courts provide a remedy for taxes exacted in violation of federal constitutional principles).

In any event, reading the TIA, in combination with state law, to foreclose any forum for plaintiffs' federal claims would create serious constitutional problems under Article III. *See Martin v. Hunter's Lessee*, 14

U.S. (1 Wheat.) 304 (1816) (Story, J.) (arguing that Article III requires that some federal court have jurisdiction over every federal claim, either by original federal jurisdiction or by state court jurisdiction with the possibility of Supreme Court review); *Webster v. Doe*, 486 U.S. 592, 603 (1988) (noting that federal statutes should ordinarily be read "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim") (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986)).

Also fundamental here, if the district court were right and this case *could* be brought against the City in a state court of general jurisdiction, then this suit would lie completely outside the TIA's animating purview. As noted above, the TIA's purpose is to protect the orderly raising of state revenue by allowing states to establish regimes in which tax protesters pay first and litigate later through specialized protest procedures. *Hibbs* thus insisted that the "plain, speedy and efficient remedy" the TIA contemplates is "not one designed for the universe of plaintiffs who sue the State," but "[r]ather . . . a remedy tailormade for taxpayers." *Hibbs*, 542 U.S. at 107. Texas already has this sort of procedure—the ARB protest regime. Insisting that the Homeowners should instead have tried a general lawsuit in an ordinary state

court is effectively a concession that this case falls outside the tax-protest regime's scope—and therefore also outside the jurisdictional bar of the TIA.

### B. Texas's *quo warranto* scheme is inapplicable and does not provide a "plain, speedy and efficient remedy."

Absent a judicial forum, the City has claimed—and the district court seemed to accept—that the Homeowners must pursue a *quo warranto* action brought by the Texas Attorney General.[11] *See* ROA.2203–04. But *quo warranto* proceedings have no place here. Unlawful annexations may be challenged in private actions when the annexation is wholly void. *See Alexander Oil Co. v. City of Seguin*, 825 S.W.2d 434, 436-438 (Tex. 1991). And because the City "exceeded the annexation authority delegated to it by the Legislature," its annexation of the Homeowners' properties is wholly void and subject to private suit. *Id.* at 438.

Besides, a *quo warranto* action would not suffice under the TIA. The TIA requires states "to provide taxpayers with a swift and certain remedy

---

[11] A *quo warranto* suit is "[a]n action by which the state seeks to revoke a corporation's charter." *Quo Warranto*, BLACK'S LAW DICTIONARY (11th ed. 2019). The purpose of these proceedings "is to question the right of a person or corporation, including a municipality, to exercise a public franchise or office. *Alexander Oil Co. v. City of Seguin*, 825 S.W.2d 434, 436–37 (Tex. 1991). For private citizens to initiate a *quo warranto* suit, they must ask either the Attorney General, a county attorney, or a district attorney to file a petition with the district court. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 66.002.

when they resist tax collections"; if the remedy is uncertain, as with "[a]n action dependent on a court's discretion," it does "not qualify as a fitting taxpayer's remedy." *Hibbs*, 542 U.S. at 108 n.10; *see also Barringer v. Griffes*, 964 F.2d 1278, 1280 (2d Cir. 1992) ("A state court remedy is not 'plain' within the meaning of the Tax Injunction Act if there is such uncertainty concerning the state remedy 'as to make it speculative . . . whether the State affords full protection to the federal rights.'").

An action brought by the Attorney General would give a remedy to *another* party—a political actor who has thus far shown no interest in acting—not to the taxpayers themselves. *Hibbs* demonstrates that states must "provide *taxpayers* with a swift and certain remedy"—not provide a remedy to someone else. 542 U.S. at 108 n.10 (emphasis added). Unsurprisingly, no precedent requires federal courts to defer to state procedures under the TIA when the state remedy bars plaintiffs from suing outright and requires them to rely upon a third party outside their control.

## III. The district court incorrectly ignored remedies not subject to the TIA.

Even if the TIA barred *some* claims or *some* remedies, the Homeowners pointed out to the district court that it does not bar all of them. Yet based on the facile proposition that this is "a tax case," the district court dismissed

the entire suit, ignoring the fact that many of the Homeowners' claims seek relief that wouldn't affect State tax operations at all. ROA.2195. In doing so, neither the magistrate judge nor the district court provided any detailed analysis of the Homeowners' claims, any discussion of how each claim impacts state institutions and revenue processes, or any analysis of the remedies available for those claims in state court.

For example, the Homeowners' federal and state equal-protection claims (Counts 5 and 14) and City Charter claim (Count 11) do not ask the Court to say that the City cannot tax the Homeowners' property. Instead, these claims assert that if the City taxes the properties, then it must give them the same level of municipal services provided to other similarly situated properties. The Homeowners' injury could be redressed by an order that the City provide such services—which the TIA would plainly not bar.

Likewise, the Homeowners' takings claims (Counts 6 and 7) have no impact on the City's tax receipts. If there was a taking, the City can pay just compensation. And under Supreme Court precedent,, the Court cannot tell the Homeowners that they have to go to state court first. *See Knick v. Township of Scott*, 139 S. Ct. 2162, 2172–73 (2019). Nor do the requirements to provide proper notice, hold a meeting, and follow other procedural

safeguards—as raised by Counts 4, 11, 15, and others—"stop" or "prohibit" the City from imposing a tax. *See Direct Marketing*, 575 U.S. at 13. They simply require that the City follow the law.

In sum, the district court wielded the TIA as a machete rather than as a scalpel, eschewing the claim-by-claim, remedy-by-remedy analysis that the Supreme Court requires. At minimum, the Court should remand the case for a determination of which of the Homeowners' causes of action are subject to the TIA, and which are not.

## IV.    The City presented no other viable grounds for dismissing the Homeowners' complaint.

The district court considered only one of the City's arguments for dismissal: that the TIA barred federal-court jurisdiction.[12] *See* ROA.2204, 2268. Because that argument lacks merit, the district court's judgment should be vacated and the case remanded for further adjudication. This Court need not delve into the City's ancillary arguments about abstention,

---

[12] Although the magistrate judge "RECOMMEND[ED] that the District Court GRANT Defendant City of Austin's Rule 12(b)(1) *and* 12(b)(6) Motion to Dismiss," the magistrate judge analyzed only the TIA issue, not mentioning any of the City's other jurisdictional or 12(b)(6) arguments. ROA.2204 (emphasis added). The district court's final judgment confirmed that it was dismissing the case only "for lack of jurisdiction." ROA.2268.

immunity, or pleading defects, which the district court did not see fit to address. *See* ROA.783–94.

Indeed, as the Supreme Court has confirmed, it is rarely appropriate for a court of appeals "to pass on issues not decided in the District Court." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 29 (1983). This case is no exception to "the general rule . . . that a federal appellate court does not consider an issue not passed upon below." *Firefighters' Retirement Sys. v. EisnerAmper, L.L.P.*, 898 F.3d 553, 561 (5th Cir. 2018) (quoting *Humphries v. Elliott Co.*, 760 F.3d 414, 418 (5th Cir. 2014)).

Should this Court nevertheless choose to examine the record for alternative grounds for affirmance, it will find none. *See Trinity Marine Prods., Inc. v. United States*, 812 F.3d 481, 486 (5th Cir. 2016). For the reasons summarized below and developed in full in the Homeowners' response to the City's motion to dismiss, none of the City's other arguments for dismissal has merit. *See generally* ROA.1221–47.

### A.    There are no grounds for abstention, and this case does not present a political question.

The City argued below that even if the TIA doesn't bar the Homeowners' suit altogether, the district court should decline to hear it on grounds of comity, abstention, or the political-question doctrine. ROA.783–

85. But because this case falls within the federal courts' ordinary federal-question jurisdiction, the district court's "'obligation' to hear and decide [it] is 'virtually unflagging.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Federal courts may decline to exercise their jurisdiction only in "'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (quoting *Colo. River*, 424 U.S. at 813).

The City has identified no such exceptional circumstances and no such countervailing interest. To the contrary, the City indiscriminately—and without any meaningful analysis—invokes comity, "other abstention doctrines," and the political-question doctrine without attempting to carry its heavy "burden of showing abstention to be proper." ROA.784; *Nat'l Cas. Co. v. Gonzalez*, 637 F. App'x 812, 816 (5th Cir. 2016). In reality, none of the doctrines the City cites deprives the federal courts of jurisdiction.

First, there is no reason to abstain on comity grounds because this case does not "risk disrupting state tax administration." *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 417 (2010). Rather, the Homeowners seek to

protect their rights and interests in a certain annexation status—that is, being within a municipality's extraterritorial or limited-purpose jurisdiction—and enforce federal and state limits on municipal power. Just because a suit might "implicate[] local taxes" downstream doesn't mean it should be booted from a federal forum. ROA.784. *See Direct Marketing*, 575 U.S. at 14.

Second, the City's scattershot invocation of *Pullman* and *Burford* abstention is so vague as to be nearly indecipherable. *See Am. Bank & Trust Co. of Opelousas v. Dent*, 982 F.2d 917, 922 (5th Cir. 1993) (Where "the propriety of *Pullman* or *Burford* abstention is not absolutely clear on the . . . record," the question is best "decided by the district court in the first instance.") The City offers no analysis of how either of these abstention doctrines might apply to the Homeowners' case, and it even stops short of asserting that they *do* in fact apply, saying only that "these forms of abstention *could* be applicable here, too." ROA.784 (emphasis added). This speculation cannot support the City's heavy burden to prove abstention proper. *Gonzalez*, 637 F. App′x at 816.

*Pullman* and *Burford* have no place here. The Homeowners' suit does not seek federal resolution of an unsettled question of state law, such that *Pullman* abstention might be warranted; rather, the Homeowners ask the

federal courts only to review the validity of a City ordinance that conflicts with *established* state and federal law. *See Nissan Motor Corp. in U.S.A. v. Harding*, 739 F.2d 1005, 1008 (5th Cir. 1984) (citing *R.R. Comm'n v. Pullman*, 312 U.S. 496, 498–99 (1941)). Nor does this case implicate the concerns underlying *Burford* abstention: it does not threaten any state effort to develop cohesive public policy on an important problem—rather, the State of Texas has already decided its policy on municipal annexation, and this suit seeks to enforce it. *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

Finally, the City does not even attempt to satisfy the six-factor test for determining whether a political question is present, nor does it establish that annexation is "exclusively within the purview of the political branches of government." *Kuwait Pearls Catering Co., WLL v. Kellogg Brown & Root Servs., Inc.*, 853 F.3d 173, 178 (5th Cir. 2017). Far from it. This case is not a challenge to a political decision made by a duly authorized political actor; rather, it is an effort to enforce the black-letter law that's already on the books—much of which was enacted in the 1980s to stop abusive land grabs by municipalities, including the City of Austin, against these very Homeowners and their predecessors. *See supra* pp. 10–11.

In other words, the Homeowners' suit seeks not to interfere with legitimate political processes but rather to preserve their properties' jurisdictional status until the City has complied with the relevant state and local rules for changing that status. As such, it is hard to see how this suit could disrupt state tax administration, interfere with any other state policy, or invade the territory of the political branches of government. In short, there are no "exceptional circumstances [that could] justify a federal court's refusal to decide a case in deference to the States." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989).

**B.    The Homeowners have standing to challenge the City's illegal annexation of their properties.**

The City does not make a typical standing argument. After all, the Homeowners clearly have an injury in fact to satisfy Article III's requirements for bringing their claims in federal court. Instead, the City argues that the Homeowners lack standing to challenge the annexation of their properties, claiming that only the State Attorney General may challenge the City's 2019 Ordinance and must do so via a *quo warranto* action. ROA.785–86.

This is false for all the reasons discussed above at pages 39-40. In brief, Texas law indeed allows private parties to challenge an annexation that is

void because the municipality exceeded its authority. *Werthmann v. City of Fort Worth*, 121 S.W.3d 803, 806 (Tex. App.—Fort Worth 2003, no pet.); *see also Alexander Oil*, 825 S.W.2d at 438 (collecting cases). Equally important, to the extent that any state-law requirement purported to limit the Homeowners' ability to bring their federal-law claims in federal court, such an impairment would fail under the Supremacy Clause. U.S. CONST. art. VI, cl. 2; *see Haywood v. Drown*, 556 U.S. 729, 736 (2009).

### C. Governmental immunity poses no hurdle to the Homeowners' federal declaratory-judgment claims.

The City next claims that its governmental immunity bars the Homeowners' federal Declaratory Judgments Act claims and their claims under the Texas Constitution. ROA.786–87. The first argument is fanciful: citing no federal authority, the City contends that because some state courts have recently interpreted the *Texas* Uniform Declaratory Judgments Act in a way that might preserve governmental immunity here, "[t]he same should be true under the federal Declaratory Judgment Act." ROA.787. But the City's wishing does not make it so. Instead, federal courts in Texas have, "on more than one occasion, . . . rejected the idea that the State is immune from declaratory judgment actions seeking to determine a party's rights under a

statute." *Reid v. Aransas Cnty.*, 805 F. Supp. 2d 322, 338–39 (S.D. Tex. 2011).

The City's second argument—that the City is immune from the Homeowners' Texas constitutional claims because those claims are "facially invalid"—fares no better. ROA.787. The Homeowners have pleaded with ample supporting detail that the City violated their state constitutional rights to be free from unconstitutional takings (Count 7) and retroactive laws (Count 12) and to receive due process (Count 13) and equal treatment under the law (Count 14).[13]

## D.    The Homeowners adequately pleaded each of their claims for relief.

The Homeowners' state constitutional claims aren't unique in their thoroughness: rather, as explained at length in the Homeowners' Response to the City's Motion to Dismiss, *each* of the Homeowners' 17 causes of action is pleaded in detail and supported by ample authority, both factual and legal. *See* ROA.1239–47. The City nevertheless contends that 13 of the Homeowners' claims for relief should be dismissed for failure to state a claim. ROA.787–94. As noted above, these arguments should be left for the

---

[13] But to the extent the City is correct about its state-law immunity in state court, this would be further support for the Homeowners' argument that they lack a plain, speedy, and efficient remedy for their claims in Texas courts.

district court to address in the first instance. *Humphries v. Elliott Co.*, 760 F.3d 414, 418 (5th Cir. 2014).

But should the Court wish to examine these issues in greater depth, the Homeowners respectfully request that the Court order supplemental briefing on the 12(b)(6) arguments. Given the space constraints of the Federal Rules, the Homeowners have chosen to focus their appeal on the TIA issue that was considered and decided below, but they will happily brief all the 12(b)(6) issues in full at the Court's request.

## CONCLUSION

The Homeowners challenge the City's retroactive annexation of their properties without due process and in violation of the Texas Local Government Code, the City's own charter, and the constitutions of Texas and the United States. They do not challenge the City's right to assess, levy, or collect taxes on properties that are properly within its jurisdiction, nor have they ever argued that their properties *cannot* be made part of the City's full-purpose jurisdiction. They ask only that the City follow federal, state, and local law—not act by fiat. These claims fall well outside the limited scope of the Tax Injunction Act, and they belong in federal court: indeed, the City's

illegal annexation is just the sort of local-government abuse of power that the federal courts are uniquely well situated to handle.

For the reasons discussed above, the Plaintiff-Appellant Homeowners respectfully request that this Court vacate the district court's judgment and remand this case for further proceedings below.

Respectfully submitted,

 /s/ Christopher S. Johns
Christopher S. Johns
Texas Bar No. 24044849
JOHNS & COUNSEL PLLC
2028 East Ben White Boulevard
Suite 240-1000
Austin, Texas 78741
512-399-3150
512-472-8005 fax
cjohns@johnsandcounsel.com

Ernest A. Young
Texas Bar No. 00791972
3208 Fox Terrace Drive
Apex, North Carolina 27502
919-360-7718
young@law.duke.edu

*Attorneys for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of January, 2023, I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/ Christopher S. Johns
Christopher S. Johns

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,709 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using version 2212 of Microsoft® Word for Windows in 14-point Equity Text A font.

 /s/ Christopher S. Johns
Christopher S. Johns

# APPENDIX 1:
# TIMELINE



Legislature allows all cities to extend their boundaries in strips along navigable streams to regulate navigation and wharfage, but municipal taxation is prohibited

City evaluates the cost of providing shoreline properties with full municipal services, but concludes that extending full services to them would be too expensive and difficult

Legislature annexes 10-vara strips to the City for the limited purpose of regulating the first Austin Dam

A new City charter confirms the 10-vara line.

City Auditor erroneously lists the shoreline properties on the City's tax roll

**1891**     **1913**     **1953**     **2018**

**1839**                                                                      **2019**

**1909**                     **1967**     **1985**

Third Texas Congress incorporates the City of Austin

New City charter reaffirms the 10-vara line

City Council unanimously resolves the City's corporate limit to be "10 varas from the old lake level"

**1986**     **1987**

City Council rules by fiat that the shoreline properties are in City's full-purpose jurisdiction

# Jurisdictional Status of Shoreline Properties From City's Founding

City Council enacts ordinance "declaring the limited purpose jurisdiction status of all shoreline properties," resolving any "confusion" regarding their legal status and recognizing that the City cannot tax these properties until it provides them with full municipal services

Texas Legislature requires municipalities to convert all limited-purpose-jurisdiction areas to full-purpose jurisdiction or disannex them completely within 16 months, and strips of land annexed along navigable streams (e.g., the shoreline properties) are automatically disannexed in 1988 if municipality fails to annex them for full purposes within one year

**APPENDIX 2:**
**DECISION TREE**

